## BYRD *v.* HALL.

### September, 1866.

Although a purchase of goods on credit, by one who knows himself to be insolvent, is not necessarily fraudulent ; yet where it is made with preconceived design not to pay, it is fraudulent ; and this design may be inferred from circumstances,—such as soon afterward failing, without any intermediate cause, and making an assignment with unjust preferences.

Where such circumstances are shown, the question of fraud should be submitted to the jury.

Upon the question of fraud in the purchase, it is admissible to prove the value of the assets transferred by the assignment.

It is also admissible to show that the assignment was fraudulent in fact, and that it was the intention of the buyer when he purchased to assign and prefer fictitious claims in favor of his friends.

False representations made at the time of the purchase of the goods as to the settlement of former debts, and also statements as to the buyer's expectation of future ability to pay, are proper to submit to the jury on the question of fraud.

George Byrd and another sued Harvey Hall in the supreme court, in replevin.

The plaintiffs were merchants in the city of New York, and, on October 9, 1858, sold to one James Brown a bill of goods amounting to five hundred and seven dollars and ninety cents, which were shipped on the 15th of the same month. On November 20 following, Brown made a general assignment to defendant, giving preferences, and, on the· 25th of the same month, this action of replevin was commenced by the plaintiffs to obtain possession of the goods so sold by them, on the ground that no title had passed by the sale to Brown.

*The court below* nonsuited the plaintiffs, on the ground that they had given no evidence to establish their cause of action. The judge held the proof was sufficient to show that Brown was insolvent when he purchased the goods, and that he was aware of it, but that under the case of Nichols *v.* Pinner, 18 *N. Y.* 295, he was not obliged to disclose the fact. The judge also held that the evidence excluded, the substance of which is stated in the opinion below, was all immaterial.

The judgment of nonsuit was affirmed by the court at general term. Plaintiffs appealed to this court.

*M. S. Newton,* for plaintiffs, appellants.—There was sufficient evidence to go to the jury, and the evidence offered was improperly excluded. Hennequin *v.* Naylor, 24 *N. Y.* 139; Nichols *v.* Michael, 23 *Id.* 264; S. C., 18 *Id.* 295; 20 *Id.* 292; Hall *v.* Naylor, 18 *Id.* 588; Darrell *v.* Haley, 1 *Paige,* 492; 20 *Wend.* 167; 23 *Id.* 611 and 372; 21 *Barb.* 584.

*Geo. F. Danforth,* for defendant, respondent.—The nonsuit was correct. Nichols *v.* Pinner, 18 *N. Y.* 295; Winchel *v.* Hicks, 18 *N. Y.* 558.

HUNT, J. [After stating above facts.]—The general principles governing this class of cases are now well settled. In Nichols v. Pinner, 18 N. Y. 295, it was decided that the mere omission of a purchaser to disclose his insolvency to the vendor is not a fraud which avoids a sale of goods ; that, where no inquiries are made, no false statements put forth, or artifice resorted to, to mislead the vendor, silence is not a fraud ; that an honest purpose to continue business and to pay for the goods is consistent with the vendee's knowledge of his own insolvency, and a.purchase made with such intent is not fraudulent, though founded in delusive and unreasonable expectations. A failure to disclose a marked change in the vendee's affairs, unknown to the vendor, it is intimated, would render the purchase fraudulent.

In Brown v. Montgomery, 20 N. Y. 287, it was held, that, upon a sale of commercial paper, to withhold information that the maker's check upon the bank in which he kept his account had been protested, was a fraudulent suppression, although the information to the vendee had been accompanied by the informant's opinion that the maker was solvent.

In 23 N. Y. 264, the case of Nichols v. Pinner was again before the court, under the name of Nichols v. Michael, and its former doctrine reiterated, but in a somewhat different form. Both the judges delivered opinions averring, in substance, that where property was obtained upon credit, with a preconceived design not to pay for it, it was a fraud avoiding the sale (p. 266) ; or, as expressed by SELDEN, J., that, where concealment of the fact of insolvency is accompanied by an intent to cheat, it is a fraud. p. 274.

And in Hennequin v. Naylor, 24 N. Y. 129, 133, the principle was affirmatively announced that, though the omission of a purchaser on credit to disclose his insolvency is not necessarily fraudulent, yet, if the purchase be made with a preconceived design not to pay, it is a fraud ; and that such design might be inferred by the jury from the circumstances and conduct of the vendee, not only in respect to the sale in question, but in other cotemporaneous transactions.

These decisions establish a system of law on this subject, har-

* See Johnson v. Monell, reported in this series.

monious, easily understood, and just. It is only in the appli-
cation of the principles that courts and juries differ. A just
appreciation of their effect, I think, must compel a reversal of
this nonsuit, both upon the order of nonsuit and upon the ex-
clusion of the evidence offered.

1. The evidence shows that in October, 1858, Brown was a
barber in Rochester, and had a small shop in front of his shav-
ing apartments, in which he kept a few fancy articles for sale;
that he then owed twenty-five hundred dollars at least (as
stated by him to the plaintiffs); that he purchased of the plain-
tiffs goods to the value of five hundred and seven dollars, and
of other merchants in New York, Boston and Philadelphia, to
the amount of four thousand six hundred and fifty-nine dollars,
at about the same time and upon credit, of which about nine
hundred dollars was for umbrellas: that it did not appear that
any of these vendors knew of the sales by the others; that there
was no reason to suppose that he had met with any loss or that
there was any change in his affairs within that period; but that
within thirty days after the goods had reached his possession,
without being sued, and without any apparent pressure, he
made an assignment of all his property thus purchased, giving
preference to his old debts to the defendant and to his nephew
Booth. This alone would require a submission of the case to
the jury, independent of all representations, that they might de-
termine whether he had not purchased the plaintiffs' goods with
a preconceived design not to pay for them. If they had reached
an affirmative conclusion, their determination would not have
been disturbed. The evidence would have sustained it.

2. It was said in Hennequin v. Naylor, *supra*, that such pre-
conceived design not to pay for the goods purchased might be
inferred by the jury from the circumstances and conduct of the
vendee, not only in respect to the sale in question, but in other
cotemporaneous transactions. I am at a loss, therefore, to un-
derstand upon what principle the court rejected the plaintiffs'
offer to show the value of the assets that had passed under the
assignment of Brown. He had made a general assignment, trans-
ferring all his property in express terms, and for the payment
primarily of his old debts. If it had appeared that he had pos-
sessed a considerable amount of property in addition to his re-

cent purchases, the jury might have considered that fact as a relief from the charge of fraud, while if he had nothing else, it would properly have been looked upon by the jury as evidence of a fraudulent design, to wit, of procuring the present goods with which to pay his more favored creditors. The comparative amount of debts, with the value of the assets on hand, is always a fair subject for the consideration of a jury.

3. Upon the same principle the court erred in excluding the plaintiffs' offer to show that the assignment of Brown was fraudulent in fact;—that it was his intention, when he purchased the goods, and a part of his plan, to assign and prefer fictitious claims in favor of his friends. It was not necessary, certainly, that the plaintiffs should show the assignment to be fraudulent, if they succeeded in showing a preconceived design not to pay for the goods. Such proof would, however, reflect strongly upon the latter point. Every fraudulent purchase is accompanied by a design to make a fraudulent transfer of the goods when obtained, either to a friend or a favored creditor. It is impossible that the fraudulent purchaser should himself retain them, as a writ of replevin or an execution would at once deprive him of the fruits of his fraud. To prove, therefore, that it was a part of the plan of the purchase that the goods should at once be placed in the hands of a friend or a fictitious creditor of the purchaser, would be among the most satisfactory evidences to a jury that the goods were never intended to have been paid for, and that a fraud had been contemplated from the outset. The court below say that this was one of those general offers, resorted to on a trial where the party has no evidence to support his action or defense, or to prove the fact offered to be proved. The plaintiffs made the offer, and their ability to sustain it should have been tested in the ordinary manner of a permission to take the answer of the witness on the stand. It would then have been in time, and then have been possible, to say that the party could not prove the fact as offered.

Again : I think the plaintiffs were entitled to the opinion of the jury on the question of fraudulent representations, which the judge ruled as a matter of law. The representations were proved by the plaintiff Byrd, and as Brown, although a witness in the case, was not asked in relation to them, the plaintiffs'

version is entitled to the fullest credit. Brown represented that he had been in business in Rochester for eleven years, that he kept a fancy goods store in front of his barber shop, where he sold shirts, collars, neck-ties, &c. When asked as to his responsibility, he said that during the time he had been in Rochester he had paid up everything promptly at maturity, except in the fall of 1857, in the crisis, when he was compelled to ask an extension of his debts, which amounted to two thousand five hundred dollars; that he had made the payments on the extension as fast as they became due, and by the first of February following they would all be paid, and he felt abundantly able to pay all his new contracts at maturity. This statement was false in at least three particulars: First, he had not promptly paid up at maturity all his debts accruing before the fall of 1857. He owed to Booth, to Powers and the defendants the debts mentioned in the assignment, amounting to over one thousand eight hundred dollars, and which had been due at least two years prior to the fall of 1857, and which formed no part of his extension paper. Second, the statement that these extended debts would all be paid by the first February following; and, third, that he felt abundantly able to pay all his new contracts at maturity, were shown by the result to be entirely false. In thirty days after making these representations, his assets consisted of property apparently of very little value, and no losses or misfortunes are alleged to have occurred after the purchase by which this result was produced. There certainly was ground to submit to a jury a doubt of this belief and expectation on his part, as represented by him to the plaintiffs, and to ask their decision upon it. Some of these representations and statements were of future expectations, of his intention and of his feelings or belief. But, if he stated them falsely, and did not so expect to believe or feel, although not the subject of indictment or false pretense, they might be cogent evidence to the jury, on a question of the preconceived design not to pay for the goods. His statements to Byrd were false in material points, and, where not distinctly untrue, were illusory and deceptive, and intended to procure a credit of which he was not worthy. The court erred, therefore, in not submitting them to the jury.

Judgment should be reversed and a new trial granted.

All the judges concurred.

Judgment reversed, and new trial ordered, costs to abide event.